Esther C. Rodriguez
Nevada State Bar No. 006473
**RODRIGUEZ LAW OFFICES, P.C.**
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Tel: (702) 320-8400; Fax: (702) 320-8401
info@rodriguezlaw.com

Richard M. Schreiber*
Texas State Bar No. 24056278
**JOSEPHSON DUNLAP LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Tel: (713) 352-1100; Fax: (713) 352-3300
rschreiber@mybackwages.com

**Pro hac vice application forthcoming*

*Attorneys for Adams and the Hourly Employees*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

AUSTIN ADAMS, Individually and On Behalf of Others Similarly Situated,

Plaintiff,

vs.

NATIONAL EWP, INC.,

Defendant.

**Case No. ________________**

**ORIGINAL CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

(1) Failure to Pay Overtime Wages (Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*);

(2) Failure to Pay for All Hours Worked Under Nevada Law (Nev. Rev. Stat. §§ 608.140 and 608.016);

(3) Failure to Pay Minimum Wages in Violation of the Nevada Constitution;

(4) Failure to Pay Overtime under Nevada Law (Nev. Rev. Stat. §§ 608.140 and 608.018); and

(5) Failure to Timely Pay All Wages Due and Owing Under Nevada Law (Nev. Rev. Stat. §§ 608.140 and 608.020-050).

# ORIGINAL CLASS AND COLLECTIVE ACTION COMPLAINT

## SUMMARY

1. Austin Adams (Adams) brings this class and collective action to recover unpaid wages and other damages from National EWP, Inc. (National) for violations of the Fair Labor Standards Act (FLSA) and Nevada law.

2. National employs Adams as one of its Hourly Employees (defined below).

3. National pays Adams and the other Hourly Employees by the hour.

4. Adams and the other Hourly Employees regularly work more than 40 hours a workweek.

5. However, National does not pay Adams and the other Hourly Employees for all their hours worked, including overtime hours.

6. Rather, National requires Adams and the other Hourly Employees suit out in protective clothing and safety gear fundamentally necessary to perform their job duties, and gather tools and other equipment fundamentally necessary to perform their job duties, "off the clock" prior to the start of their shifts.

7. Likewise, National requires Adams and the other Hourly Employees to change out of and store their safety gear and protective clothing, and store other tools and equipment, "off the clock" following the end of their shifts (¶¶ 6 and 7 collectively National's "pre/post shift off the clock policy").

8. But National does not pay Adams and the other Hourly Employees for this time before and after their shifts.

9. National's pre/post shift off the clock policy violates the FLSA and Nevada law by depriving Adams and the other Hourly Employees of wages, including overtime wages, for all hours worked.

10. Likewise, National's pre/post shift off the clock policy violates Nevada Law by depriving Adams and the other Hourly Employees of timely payment of earned wages for all hours worked upon termination of their employment.

11. In addition to failing to pay Adams and the other Hourly Employees for all their hours worked, National also fails to pay them overtime wages at the required premium overtime rate.

12. Instead, National pays them non-discretionary bonuses calculated based on factors established by National, including production and safety, in combination with the number of hours worked by each Hourly Employee (National's bonus pay scheme).

13. National's bonus pay scheme violates the FLSA and Nevada law by depriving Adams and the other Hourly Employees of overtime at rates of at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 in a workweek.

14. Likewise, National's bonus pay scheme violates Nevada law by depriving Adams and the other Hourly Employees of timely payment of earned wages for all hours worked, including overtime hours, upon termination of employment.

15. Finally, National pays Adams and the Hourly Employees "per diems" but only for days they actually work and these "per diems" are not calculated to approximate and reimburse incidental travel or business expenses. (National's per diem pay scheme).

16. National's per diem pay scheme violates the FLSA and Nevada law by depriving Adams and the other Hourly Employees of overtime at rates of at least 1.5 times their regular rates of pay—based on all remuneration—for hours worked in excess of 40 a workweek.

17. Likewise, National's bonus pay scheme violates Nevada law by depriving Adams and the other Hourly Employees of timely payment of earned wages for all hours worked, including overtime hours, upon termination of employment.

## JURISDICTION & VENUE

18. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

19. This Court has supplemental jurisdiction of the state-law claims because they arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

20. This Court has general personal jurisdiction over National because National is a Nevada corporation.

21. Venue is proper because National maintains its principal place of business in Elko, Nevada which is in the District of Nevada. *See* 28 U.S.C. § 1391(b)(1).

## PARTIES

22. National employed Adams from approximately December 2022 until March 2025, including in Nevada from approximately August 2024 until March 2025.

23. National classified Adams as non-exempt and paid him by the hour.

24. National subjected Adams to its pre/post shift off the clock policy, per diem pay scheme, and bonus pay scheme.

25. Adams's written consent is attached as **Exhibit 1**.

26. Adams brings this class and collective action on behalf of himself and other similarly situated National employees who were also subject to National's pre/post shift off the clock policy, per diem pay scheme, and/or bonus pay scheme.

27. The FLSA collective of similarly situated employees is defined as:

> **All hourly National employees during the past 3 years through final resolution of this action ("FLSA Collective Members").**

28. Adams also seeks to represent a class under Nevada law pursuant to FED. R. CIV. P. 23.

29. The Nevada Class of similarly situated employees is defined as:

> **All hourly National employees during the past 4 years in Nevada through final resolution of this action ("Nevada Class Members").**

30. The FLSA Collective Members and Nevada Class Members are collectively referred to as the "Hourly Employees."

31. National is a domestic corporation headquartered in Elko, Nevada.

32. National may be served with process by serving its registered agent: **C T Corporation System, 701 S. Carson St., Ste. 200, Carson City, Nevada 89701**.

## FLSA COVERAGE

33. At all relevant times, National has been an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

34. At all relevant times, National has been an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

35. At all relevant times, National has been an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as personal protective equipment, tools, drills, computers, tablets, etc.—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

36. At all relevant times, National has had an annual gross volume of revenue made or business done of over $1,000,000 each year.

37. At all relevant times, Adams and the other Hourly Employees have been National's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

38. At all relevant times, Adams and the other Hourly Employees have been engaged in commerce or in the production of goods for commerce.

## FACTS

39. National touts itself as "not just another drilling contractor [but] a team of subject-matter experts . . . [with] teams [that] operate 24 hours a day, 7 days a week" to deliver "cost-effective drilling services with very technical capabilities and an unparalleled safety culture . . . to the mining, water and energy markets."[1]

---

[1] https://www.nationalewp.com/ (last visited July 15, 2025).

40. To meet its business objectives, National hires workers, like Adams and the other Hourly Employees.

41. While job titles and duties may differ, Adams and the other Hourly Employees are all subject to National's same or similar illegal policies—its pre/post shift off the clock policy, per diem pay scheme, and bonus pay scheme—while performing the same or similar work.

42. For example, Adams worked for National as a lead assistant driller from approximately December 2022 until March 2025, in Michigan (May 2022 to May 2023), Utah (August 2023 to May 2024), and Nevada (May to August 2023 and August 2024 to April 2025).

43. As a driller assistant, Adams' job duties included monitoring drilling parameters, such as weight on bit, torque, pressure, and rate of penetration, and adjusts them as needed to ensure optimal drilling operations.

44. Adams's job duties likewise included donning and doffing safety gear and protective clothing, gathering and storing tools and equipment, and attending safety meetings, "off the clock," before and after his scheduled shifts on National's clients' premises.

45. National paid Adams by the hour.

46. National paid Adams approximately $35 an hour.

47. Throughout his employment, Adams worked 7 days a week for approximately 12 hours a day "on the clock" (84 hours a week).

48. Likewise, the other Hourly Employees generally work approximately 7 days a week for approximately 12 hours a day "on the clock" (84 hours a week), generally for two weeks on followed by one week off.

49. National records Adam's and the other Hourly Employees' "on the clock" hours as a flat 12 hours a day, regardless of how many hours they actually work.

50. But throughout their employment, National has not paid Adams and the other Hourly Employees for all their hours worked.

51. Instead, National subjects Adams and the other Hourly Employees to its pre/post shift off the clock pay scheme.

52. For example, National required Adams to dress out in his protective clothing and safety gear (including hard hat, reflective clothing, ear protection, steel toed boots, safety glasses, gloves), gather tools and equipment necessary to performing his job, and attend safety meetings, prior to his shifts, on National's clients' premises, "off the clock," and without compensation.

53. This took Adams approximately 30 minutes each workday.

54. Adams could not perform his job duties in accordance with National's policies, procedures, and expectations without this protective clothing, safety gear, tools, equipment, and safety meeting attendance.

55. Adams could not safely perform his job duties in accordance with National's policies, procedures, and expectations without this protective clothing, safety gear, tools, equipment, and meetings.

56. Indeed, much of the safety gear Adams must utilize is mandated by federal regulation. *See*, *e.g.*, 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq*.

57. The donning of protective clothing and safety gear, gathering of tools and equipment, and safety meetings are integral and indispensable work duties for Adams fundamentally intertwined in his drilling job duties.

58. Likewise, National required Adams to remove and store his safety gear and protective clothing, and store his tools and equipment, and shower "off the clock" and without compensation.

59. This took Adams approximately 10 to 15 minutes each workday.

60. Adams could not perform his job duties in accordance with National's policies, procedures, and expectations without removing and storing his safety gear and protective clothing, storing his tools and equipment, and showering, on National's clients' premises "off the clock," and without compensation.

61. Adams could not safely perform his job duties in accordance with National's policies, procedures, and expectations without removing his safety gear, storing tools and equipment, and showering each day.

62. The removal and storage of his safety gear and protective clothing, storing of tools and equipment, and showering are therefore integral and indispensable work duties for Adams.

63. But under its pre/post shift off the clock policy, National does not compensate Adams for the same.

64. Thus, because of its pre/post shift off the clock policy, National fails to pay Adams wages for all hours worked, including overtime wages for all overtime hours worked, in violation of the FLSA and Nevada Law.

65. Adams and the other Hourly Employees perform their jobs under National's supervision and use materials, equipment, and technology National approves and supplies.

66. National requires Adams and the other Hourly Employees to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

67. At the end of each pay period, Adams and the other Hourly Employees receive wages from National that are determined by common systems and methods that National selects and controls.

68. But, just as with Adams, National fails to pay the other Hourly Employees for all their hours worked.

69. Indeed, National subjects the other Hourly Employees to its pre/post shift off the clock policy.

70. Specifically, like Adams, National requires the other Hourly Employees to dress out in their protective clothing and safety gear (including hard hat, reflective clothing, ear protection, steel toed boots, safety glasses gloves), gather other tools and equipment fundamentally necessary to performing their jobs, and attend safety meetings, prior to their scheduled shifts, "off the clock," and without compensation.

71. As with Adams, much of the safety gear the other Hourly Employees must utilize is mandated by federal regulation. *See e.g.*, 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq*.

72. And National requires the other Hourly Employees to remove and store their safety gear and protective clothing, store other tools and equipment, and shower, "off the clock" and without compensation.

73. But, like Adams, the other Hourly Employees are forced to perform this compensable work "off the clock" before and/or after their scheduled shifts.

74. And, just as with Adams, National does not pay the other Hourly Employees for this integral and indispensable work they perform "off the clock" before and after their scheduled shifts.

75. And like Adams, these job duties take the other Hourly Employees approximately 40 to 45 minutes each workday.

76. National fails to exercise its duty as the Hourly Employees' employer to ensure they are not performing work "off the clock" on its clients' premises that it does not want performed.

77. And National knows, should know, or recklessly disregards whether Adams and the other Hourly Employees routinely perform work "off the clock," and without compensation, before and after their scheduled shifts.

78. Thus, National requires, requests, suffers, or permits Adams and the other Hourly Employees to work "off the clock," without compensation, before and after their scheduled shifts.

79. Despite accepting the benefits, National does not pay Adams and the other Hourly Employees for the compensable work.

80. Thus, under National's pre/post shift off the clock policy, Adams and the other Hourly Employees are denied wages, including overtime wages.

81. Further, throughout their employment, National paid Adams and the other Hourly Employees according to its bonus pay scheme.

82. Specifically, National paid Adams and the other Hourly Employees non-discretionary bonuses calculated based on factors including safety, productivity, and hours worked.

83. National agreed to pay and subsequently pays Adams and the other Hourly Employees non-discretionary bonuses.

84. For example, during the weekly pay period ending December 7, 2024, National paid Adams a $2,625 safety and production bonus:

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Bonus | | | 2,625.00 | 2,625.00 |
| Regular | | | | 32,690.00 |
| Overtime | | | | 27,903.75 |
| Holiday | | | | 1,120.00 |
| Pto | | | | 1,890.00 |
| Training | | | | 350.00 |
| **Total Hours and Gross** | | | **$2,625.00** | 66,578.75 |

85. But National failed to calculate the bonuses into Adam's regular rate of pay for the purpose of calculating his overtime wages:

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 35.0000 | 40.00 | 1,400.00 | 34,090.00 |
| Overtime | 52.5000 | 20.00 | 1,050.00 | 28,953.75 |
| Bonus | | | | 2,625.00 |
| Holiday | | | | 1,120.00 |
| Pto | | | | 1,890.00 |
| Training | | | | 350.00 |
| **Total Hours and Gross** | | **60.00** | **$2,450.00** | 69,028.75 |

86. National knew these non-discretionary bonuses should have been, but were not, included in Adams's and the other Hourly Employees' regular rates of pay for overtime purposes.

87. But under its bonus pay scheme, National fails to include these bonuses in the Hourly Employees' regular rates of pay for overtime purposes.

88. And National likewise pays Adams and the other Hourly Employees under its per diem pay scheme.

89. Specifically, National pays Adams and the other Hourly Employees "per diems," that are not calculated to approximate and reimburse incidental expenses.

90. And National only pays "per diems" on days the Hourly Employees actually work, rather than on all days they incur business expenses, while away from home.

91. But under its per diem pay scheme, National fails to include these "per diems" in the Hourly Employees' regular rates of pay for overtime purposes.

92. Thus, under its bonus pay scheme and per diem pay scheme, National fails to pay Adams and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 in a workweek.

## CLASS & COLLECTIVE ACTION ALLEGATIONS

93. Adams brings his claims as a class and collective action under Section 216(b) of the FLSA and under Nevada law pursuant to Fed. R. Civ. P. 23.

94. Like Adams, the other Hourly Employees are victimized by National's pre/post shift off the clock policy, per diem pay scheme, and/or bonus pay scheme.

95. Other Hourly Employees worked with Adams and indicated they were paid in the same manner, performed similar work, and were subject to National's same pre/post shift off the clock policy, per diem pay scheme, and/or bonus pay scheme.

96. Based on his experiences with National, Adams is aware National's pre/post shift off the clock policy, per diem pay scheme, and/or bonus pay scheme were imposed on other Hourly Employees.

97. The Hourly Employees are similarly situated in the most relevant respects.

98. Even if their precise job duties and locations might vary, these differences do not matter for the purpose of determining their entitlement to wages for all hours worked, including overtime wages.

99. Rather, the Hourly Employees are held together by National's pre/post shift off the clock policy, per diem pay scheme, and bonus pay scheme, which systematically deprive Adams and the other Hourly Employees of required wages, including required overtime wages, for all hours worked, including hours in excess of 40 in a workweek.

100. Therefore, the specific job titles or job locations of the Hourly Employees do not prevent class or collective treatment.

101. National's failure to pay these employees "straight time" and overtime wages at the rates required by the FLSA and/or Nevada law results from generally applicable, systematic policies, and practices that are not dependent on the personal circumstances of the Hourly Employees.

102. National's records show the number of hours the Hourly Employees worked "on the clock" each workweek.

103. National's records also show it paid the Hourly Employees non-discretionary bonuses and "per diems" it failed to include in their regular rates of pay.

104. The back wages owed to Adams and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

105. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to National's records, and there is no detraction from the common nucleus of liability facts.

106. Therefore, the issue of damages does not preclude class or collective treatment.

107. Adams's experiences are therefore typical of the experiences of the other Hourly Employees.

108. Adams has no interest contrary to or in conflict with, the other Hourly Employees that would prevent class or collective treatment.

109. Like each Hourly Employee, Adams has an interest in obtaining the unpaid wages owed under federal and Nevada law.

110. Adams and his counsel will fairly and adequately protect the interests of the other Hourly Employees.

111. Adams retained counsel with significant experience in complex class and collective action litigation.

112. A class and collective action is superior to other available means for fair and efficient adjudication of this action.

113. Absent this class and collective action, many Hourly Employees will not obtain redress for their injuries, and National will reap the unjust benefits of violating the FLSA and Nevada law.

114. Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome.

115. Indeed, the multiplicity of actions would create a hardship for the Hourly Employees, the Court, and National.

116. Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

117. The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual Hourly Employees.

118. Among the common questions of law and fact are:

a. Whether National's pre/post shift off the clock policy failed to compensate the Hourly Employees for all hours worked;

b. Whether National's pre/post shift off the clock policy deprived the Hourly Employees of overtime when they worked more than 40 hours in a workweek;

c. Whether National paid the Hourly Employees non-discretionary bonuses;

d. Whether National paid the Hourly Employees "per diems" not calculated to reimburse travel and business expenses;

e. Whether National failed to include non-discretionary bonuses and/or "per diems" in calculating the Hourly Employees' regular rates of pay;

f. Whether National failed to pay the Hourly Employees overtime wages at the required premium rate—based on all remuneration—for all overtime hours worked;

g. Whether National's decision not to pay the Hourly Employees overtime wages at the required rate—based on all remuneration—for all overtime hours worked was made in good faith;

h. Whether National's pre/post shift off the clock policy and bonus pay scheme deprived the Hourly Employees of earned wages, including overtime wages, upon termination of employment; and

i. Whether National's violations were willful.

119. National's pre/post shift off the clock policy, per diem pay scheme, and bonus pay scheme deprived Adams and the other Hourly Employees of wages, including overtime wages, they are owed under federal and Nevada law.

120. There are many similarly situated Hourly Employees who have been denied wages, including overtime wages, in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

121. The Hourly Employees are known to National and can be readily identified and located through National's business and personnel records.

**NATIONAL'S VIOLATIONS WERE WILLFUL**

122. National knew it was subject to the FLSA's overtime provisions and Nevada Law's minimum wage, hours of work, overtime, and earned wages provisions.

123. National knew the FLSA and Nevada law required it to pay non-exempt employees, including the Hourly Employees, overtime at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek.

124. National knew each Hourly Employee worked more than 40 hours in at least one workweek during the relevant period(s).

125. National knew it paid its Hourly Employees according to its pre/post shift off the clock policy, per diem pay scheme, and bonus pay scheme.

126. National knew it had a duty to ensure its Hourly Employees were not performing work "off the clock" (without pay).

127. National knew it required the Hourly Employees to don and doff safety gear and protective clothing, gather and store tools and equipment, attend safety meetings, and shower "off the clock" on its clients' premises.

128. National knew it controlled the Hourly Employees' work procedures.

129. National knew its Hourly Employees' mandatory "off the clock" work was a fundamental requirement of their jobs.

130. National knew its Hourly Employees' mandatory "off the clock" work was an integral and indispensable requirement embedded in their drilling job duties.

131. National knew its Hourly Employees routinely performed this daily, required "off the clock" work for National's benefit.

132. In other words, National knew its Hourly Employees performed compensable work (*e.g.*, donning/doffing their safety gear and protective clothing, gathering and storing tools and equipment, attending meetings, and showering) "off the clock" and without compensation.

133. National knew its pre/post shift off the clock policy and bonus pay scheme failed to compensate the Hourly Employees for all hours worked, including overtime hours, at the required rates.

134. National knew, should have known, or showed reckless disregard for whether its conduct described in this Complaint violated the FLSA and Nevada law.

135. National knowingly, willfully, and/or in reckless disregard carried out its pre/post shift off the clock policy, per diem pay scheme, and bonus pay scheme systematically deprived the Hourly

Employees of "straight time" wages, earned wages, and overtime for their hours worked over 40 in a workweek, in violation of the FLSA and Nevada law.

**COUNT I**
**FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA**
**(FLSA COLLECTIVE)**

136. Adams bring his FLSA claim as a collective action on behalf of himself and the other FLSA Collective Members pursuant to 29 U.S.C. § 216(b).

137. National violated, and is violating, the FLSA by employing non-exempt employees (Adams and the other FLSA Collective Members) in a covered enterprise for workweeks in excess of 40 hours without paying them overtime wages at rates of at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

138. National's unlawful conduct harmed Adams and the other FLSA Collective Members by depriving them of the overtime wages they are owed.

139. Accordingly, National owes Adams and the other FLSA Collective Members the difference between the wages actually paid and the required overtime wages earned, based on all remuneration.

140. Because National knew, or showed reckless disregard for whether, its pre/post shift off the clock policy, per diem pay scheme, and bonus pay scheme violated the FLSA, National owes Adams and the other FLSA Collective Members these wages for at least the past 3 years.

141. National is also liable to Adams and the other FLSA Collective Members for an amount equal to all their unpaid wages as liquidated damages.

142. Finally, Adams and the other FLSA Collective Members are entitled to recover all reasonable attorney's fees and costs incurred in this action.

**COUNT II**
**FAILURE TO PAY FOR ALL HOURS WORKED**
**(NEVADA CLASS MEMBERS)**

143. Adams brings his claim for failure to pay for all hours worked as a class action on behalf of himself and the other Nevada Class Members under Nevada law pursuant to Fed. R. Civ P 23.

144. Adams has a private cause of action for unpaid wages pursuant to NRS 608.140. *See Neville v. Eighth Judicial District Court in and for County of Clark*, 406 P.3d 777, 783 (Nev. 2017).

145. At all relevant times, National was subject to Nevada law because National was (and is) an "employer" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.011.

146. At all relevant times, National employed Adams and each Hourly Employee as its covered "employees" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.010.

147. NRS 608.016 provides that "an employer shall pay to the employee[s] wages for each hour the employee[s] worked." Nev. Rev. Stat. § 608.016.

148. Specifically, pursuant to the Nevada Administrative Code, hours worked includes "all time worked by the employee at the direction of the employer, including time worked by the employee that is outside the scheduled hours of work of the employee." Nev. Admin. Code 608.115(1).

149. National failed to compensate Adams and the other Nevada Class Members for all hours worked, as described in this Complaint.

150. Accordingly, Adams "bring[s] a civil action to recover the difference between the amount paid to [Adams and the Nevada Class Members] and the amount of the minimum wage," for each hour worked. Nev. Rev. Stat. § 608.260.

151. As noted, National did not compensate Adams and the other Nevada Class Members for integral and indispensable work before and after their shifts, performed under National's direction and control and on National's premises.

152. Nevada's Minimum Wage Amendment to the Nevada Constitution, Nev. Const. Art. 15, § 16, guarantees a minimum wage for each individual hour worked, rather than as an average over a workweek. *See Porteous v. Capital One Servs. II, LLC*, 809 F. App'x 354, 357 (9th Cir. 2020).

153. Adams and the other Nevada Class Members have been deprived of their rightfully earned wages as a direct and proximate result of National's company-wide policies and practices.

154. As a direct and proximate result, Adams and the other Nevada Class Members have suffered, and continue to suffer, substantial damages.

155. National regularly, willfully, and repeatedly failed and continues to fail to make, keep, and preserve accurate time records required by NRS 608.115, with respect to Adams and the Nevada Class Members.

156. Through this unlawful course of conduct, National has deprived and continues to deprive Adams and the Nevada Class Members of records necessary to calculate with precision the compensation due to them.

157. National's actions were (and are) willfully oppressive, fraudulent and malicious, entitling Adams and the Nevada Class Members to punitive damages.

158. National's violations were intentional.

159. In accordance with NRS 608.140, demand has been made to National for wages and penalties due on a class-wide basis, in writing, at least 5 days before this suit was filed.

160. Accordingly, Adams and the Nevada Class Members are entitled to recover their regular hourly rate of pay or the minimum wage rate, whichever is higher, for all unpaid hours worked, punitive damages, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including, but not limited to all damages, fees and costs, available under Nevada law. *See* Nev. Rev. Stat. § 608.005 *et seq*.

## **COUNT III**
## **FAILURE TO PAY MINIMUM WAGES**
## **(NEVADA CLASS MEMBERS)**

161. Adams brings his failure to pay minimum wages claim as a class action on behalf of himself and the other Nevada Class Members under Nevada law and pursuant to Fed. R. Civ P 23.

162. Adams has a private cause of action for unpaid wages pursuant to NRS 608.140. *See Neville v. Eighth Judicial District Court in and for County of Clark*, 406 P.3d 777, 783 (Nev. 2017).

163. At all relevant times, National was subject to Nevada law because National was (and is) an "employer" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.011.

164. At all relevant times, National employed Adams and each Nevada Class Member as its covered "employees" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.010.

165. Nev. Const. Art. 15, § 16 sets forth the minimum wage requirements in the State of Nevada. Section 16 provides that:

> The provisions of the section may not be waived by agreement between an individual employee and an employer. . . . An employee claiming violation of the section may bring an action against his or her employer in the courts of the State to enforce the provisions of the section and shall be entitled to all remedies available under the law or in equity appropriate to remedy any violation of the section, including but not limited to back pay, damages, reinstatement or injunctive relief. An employee who prevails in any action to enforce the section shall be awarded his or her reasonable attorney's fees and costs.

166. Accordingly, Adams and the Nevada Class Members are entitled to recover their regular hourly rate of pay or the minimum wage rate, whichever is higher, for all unpaid hours worked, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including, but not limited to all damages, fees and costs, available under Nevada law.

## COUNT IV
## FAILURE TO PAY OVERTIME WAGES
## (NEVADA CLASS MEMBERS)

167. Adams brings his failure to pay overtime claim as a class action on behalf of himself and the other Nevada Class Members under Nevada law and pursuant to Fed. R. Civ P 23.

168. Adams has a private cause of action for unpaid overtime wages pursuant to NRS 608.140. *See Neville v. Eighth Judicial District Court in and for County of Clark*, 406 P.3d 777, 783 (Nev. 2017).

169. At all relevant times, National was subject to Nevada law because National was (and is) an "employer" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.011.

170. At all relevant times, National employed Adams and each Nevada Class Member as its

covered "employees" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.010.

171. Nevada law requires that employers, such as National, pay employees, such as Adams and the Nevada Class Members at least 1.5 times their regular rate of pay for all hours worked in excess of 40 a workweek. Nev. Rev. Stat. § 608.018(2).

172. Adams and the Nevada Class Members have been deprived of their overtime wages at the required rate—based on all remuneration—for all hours worked in excess of 40 a workweek as a direct and proximate result of National's pre/post shift off the clock policy and bonus pay scheme.

173. National regularly, willfully, and repeatedly failed and continues to fail to make, keep, and preserve accurate time records required by NRS 608.115, with respect to Adams and the Nevada Class Members.

174. Through this unlawful course of conduct, National has deprived and continues to deprive Adams and the Nevada Class Members of records necessary to calculate with precision the overtime compensation due to them.

175. National's actions were willfully oppressive, fraudulent and malicious, entitling Adams and the Nevada Class Members to punitive damages.

176. National's violations were intentional.

177. In accordance with NRS 608.140, demand has been made to National for wages and penalties due on a class-wide basis, in writing, at least 5 days before this suit was filed.

178. Accordingly, Adams and the Nevada Class Members are entitled to recover unpaid overtime wages owed, punitive damages, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including, but not limited to all damages, fees and costs, available under Nevada law. *See* Nev. Rev. Stat. § 608.005 *et seq.*

## COUNT V
## FAILURE TO PAY ALL WAGES UPON TERMINATION
## (NEVADA CLASS MEMBERS)

179. Adams brings his failure to timely pay wages claim as a class action on behalf of himself and the other Nevada Class Members under Nevada law and pursuant to FED. R. CIV. P. 23.

180. Adams has a private cause of action for unpaid wages pursuant to NRS 608.140. *See Neville v. Eighth Judicial District Court in and for County of Clark*, 406 P.3d 777, 783 (Nev. 2017).

181. At all relevant times, National was subject to Nevada law because National was (and is) an "employer" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.011.

182. At all relevant times, National employed Adams and each Nevada Class Member as its covered "employees" within the meaning of Nevada law. *See* Nev. Rev. Stat. § 608.010.

183. When an employer, such as National, terminates an employee, such as Adams or the Nevada Class Members, their wages and compensation earned but unpaid at the moment of discharge immediately become due and payable and become due and payable to a quitting or resigning employee within 7 days or the next regular payday. Nev. Rev. Stat. §§ 608.020 and 608.030.

184. Employers that do not pay discharged employees all earned wage "[w]ithin 3 days after the wages or compensation of a discharged employee becomes due" and pay all quitting or resigning employees "on the day the wages or compensation is due" are subject to a penalty equivalent to "the wages or compensation of the employee at the same rate from the day the employee resigned, quit or was discharged or placed on nonworking status until paid or for 30 days, whichever is less." Nev. Rev. Stat. 608.040(1)(a-b).

185. NRS 608.050 grants an "employee lien" to each discharged or laid-off employee for the purpose of collecting the wages or compensation owed to them "in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default." Nev. Rev. Stat. § 608.050.

186. By failing to pay Adams and the Nevada Class Members for all hours worked (including minimum wages, regular wages, and/or overtime wages owed) at the required rates based on all remuneration, in violation of Nevada law, National has failed to timely pay all wages due and owing to Adams and the Nevada Class Members who have separated their employment.

187. National's violations were intentional.

188. In accordance with NRS 608.140, demand has been made to National for wages and penalties due on a class-wide basis, in writing, at least 5 days before this suit was filed.

189. Adams and the Nevada Class Members who are no longer employed by National, are entitled to recover an additional 30 days' wages under NRS 608.050, plus costs, interest, and attorneys' fees, as provided by Nevada law, and all other appropriate relief under Nevada law including, but not limited to all available damages and penalties.

## JURY DEMAND

190. Adams demands a trial by jury on all Counts.

## RELIEF SOUGHT

WHEREFORE, Adams, individually and on behalf of the other Hourly Employees, seeks the following relief:

a. An Order designating this lawsuit as a collective action and authorizing notice pursuant to 29 U.S.C. § 216(b) be sent to the FLSA Collective Members allowing them to join this action by filing a written notice of consent;

b. An Order designating this lawsuit as a class action pursuant to FED. R. CIV. P. 23;

c. An Order appointing Adams and his counsel to represent the interests of the Hourly Employees;

d. An Order finding National liable to Adams and the Hourly Employees for their unpaid overtime wages, liquidated damages, and any penalties, owed under the FLSA, plus interest;

e. An Order finding National liable to Adams and the Hourly Employees for all unpaid minimum wages, overtime wages, earned wages, penalties, and all damages, including punitive damages, owed and available under Nevada law, plus interest;

f. A Judgment against National awarding Adams and the Hourly Employees all their unpaid wages, including overtime wages, liquidated damages, statutory damages, and any other penalties available under the FLSA and/or Nevada law;

g. An Order awarding attorney's fees, costs, and expenses to the Hourly Employees;

h. Pre- and post-judgment interest at the highest applicable rates; and

i. Such other and further relief as may be necessary and appropriate.

Dated: July 23, 2025.

Respectfully submitted,

**RODRIGUEZ LAW OFFICES, P.C.**

By: */s/ Esther Rodriguez*
Esther C. Rodriguez
Nevada State Bar No. 006473
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Tel: (702) 320-8400; Fax: (702) 320-8401
info@rodriguezlaw.com

Richard M. Schreiber*
Texas State Bar No. 24056278
**JOSEPHSON DUNLAP LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Tel: (713) 352-1100; Fax: (713) 352-3300
rschreiber@mybackwages.com

**Pro hac vice application forthcoming*

**ATTORNEYS FOR ADAMS & THE HOURLY EMPLOYEES**

# EXHIBIT 1

CONFIDENTIAL FAIR LABOR STANDARDS ACT EMPLOYMENT SERVICES CONSENT

Print Name: Austin Adams

1. I hereby consent to make a claim against National EWP to pursue my claims of unpaid overtime during the time that I worked with the company.

2. I designate the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC as my attorneys to prosecute and make decisions concerning my wage claims, the manner and method of conducting this litigation, the entering of an agreement with Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.

3. I authorize the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC to use this consent to file my claim in a separate lawsuit, class/collective action, or arbitration against National EWP.

4. I understand that, by filing this Consent Form, I will be bound by the Judgment of the Court or arbitrator on all issues in this case.

Signature: Austin Adams
Austin Adams (Apr 28, 2025 10:19 PDT)

Date Signed: Apr 28, 2025